## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RICHARD THORPE and DARREL WEISHEIT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WALTER INVESTMENT MANAGEMENT, CORP., MARK J. O'BRIEN, DENMAR DIXON, KEITH A. ANDERSON, BRIAN COREY, CHARLES E. CAUTHEN and C. MARC HELM,<br><br>Defendants. | **Case No. 1:14-cv-20880-UU**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

### <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Lead plaintiff Richard Thorpe and named plaintiff Darrel Weisheit (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants Walter Investment Management Corp. ("Walter Investment" or the "Company"), Mark J. O'Brien, Denmar Dixon, Keith A. Anderson, Brian Corey, Charles E. Cauthen and C. Marc Helm (collectively, the "Defendants"), alleges the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Walter Investment, analysts' reports and advisories about the Company, and

information readily obtainable on the Internet.[1] Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased Walter Investment securities between May 9, 2012 and February 26, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      Walter Investment is a loan servicer and loan origination provider focused on generating recurring, fee-based revenues from an "asset-light" platform.  The types of loans serviced by the Company include less-than-prime, non-conforming and other credit-challenged mortgage assets.

3.      The Company grew rapidly during the Class Period, capitalizing on distressed homeowners and borrowers after the 2008 financial crisis by purchasing the servicing, or debt-collecting, rights for distressed mortgages, reverse mortgages and other types of loans.

4.      On July 1, 2011, Walter Investment acquired Green Tree Servicing LLC ("Green Tree"), one of the largest servicers of home loans in the country, specializing in servicing sub-prime residential mortgages (*i.e.*, debt collection of financially stressed homeowners). Green Tree is now a wholly-owned subsidiary of Walter Investment.  On November 7, 2012, Walter Investment acquired Reverse Mortgage Solutions, Inc. ("RMS") through a stock purchase

---

[1] By Order dated May 7, 2014, the Court previously appointed Richard Thorpe and Steven Beck as Co-Lead Plaintiffs in this action.  Mr. Beck is not proceeding with the litigation; Plaintiffs are therefore filing his voluntary Notice of Dismissal concurrently with the filing of this Amended Complaint.

agreement for consideration of approximately $120 million. Now a wholly-owned subsidiary of Walter Investment, RMS both originates and services reverse mortgages.

5.      In January 2013, Walter Investment and Green Tree purchased from Bank of America, N.A. the mortgage servicing rights for roughly 650,000 mortgage loans worth $93 billion dollars. That same month, Walter Investment also acquired Residential Capital LLC ("ResCap") for approximately $490 million. Thus, in 2013 alone, Walter Investment's servicing portfolio grew by over $120 billion as a result of these bulk portfolio acquisitions—more than doubling its servicing portfolio in a single month.

6.      Despite the Company's extraordinary growth, Defendants represented during the Class Period that the Company maintained the highest level of oversight and strict internal controls over its servicing protocols and procedures.  The Company also represented that it maintained a high level of compliance with regulatory and legal requirements.

7.      In fact, the Company had woefully inadequate internal controls over its financial reporting, as well as with its loan servicing and other loan operations. As a result, the Company was plagued by servicing errors and shoddy financial reporting, and engaged in widespread loan servicing errors and violations of consumer protection laws and other applicable regulations.

8.      The Company first disclosed that Green Tree was under government investigation on March 3, 2012,  but insisted that its practices were legal:

> In November 2010, the Federal Trade Commission, or FTC, issued a Civil Investigation Demand, or CID, to an unknown number of mortgage servicers, including Green Tree, requesting information on a broad range of subjects relating to the companies' operations. In November 2011, Green Tree received a Supplementary Discovery Request from the FTC seeking additional information. The Company has, and will continue to cooperate with the FTC and ***does not believe that it has violated in any material respect any laws or regulations***.

9.     On March 18, 2013, the Company shocked investors by disclosing that management had identified a "material weakness our internal control over financial reporting, and that "[a]s a result of this material weakness, management has concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our internal control over financial reporting was not effective."

10.     On this news the Company's shares fell $8.61 per share to close on March 19, 2013 at $32.98 per share, a drop of over 20%.

11.     On June 6, 2013, the Company revealed that it had failed "to record certain estimated liabilities to investors relating to servicing errors by RMS," an error that was "material to the balance sheets and income statements included in the RMS Historical Financial Statements" and that "the Affected 8-Ks should no longer be relied upon."

12.     On November 6, 2013, the Company revealed that it received a subpoena from the HUD Office of Inspector General requesting "documents and other information concerning (i) the curtailment of interest payments on HECM loans serviced or sub-serviced by RMS and (ii) RMS' contractual arrangements with a third party vendor for the management and disposition of real estate owned properties." The Company also announced that the Consumer Financial Protection Bureau ("CFPB") staff were considering recommending that the agency take action against Green Tree for various violations of consumer financial laws.

13.     On this news, on November 7, 2013, the Company's shares fell another $2.51 per share to close at $33.41.

14.     Subsequently, on February 27, 2014, the Company announced in a Form 8-K filing that FTC and CFPB staff were seeking authority to bring an enforcement against Green Tree:

On October 7, 2013, the CFPB notified Green Tree, that the CFPB's staff is considering recommending that the CFPB take action against Green Tree for alleged violations of various federal consumer financial laws. On February 20, 2014, the FTC and CFPB staff advised Green Tree that it has sought authority to bring an enforcement action and negotiate a resolution related to alleged violations of various federal consumer financial laws.

15.     On this news, shares of Walter Investment fell from $28.28 to $25.90, more than 8%, on unusually heavy trading volume, on February 27, 2014.

16.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had inadequate and lax compliance controls with respect to applicable legal and regulatory schemes; (2) the Company's business practices violated consumer protection laws repeatedly and jeopardized the Company's revenues and profits; (3) the Company ignored repeated servicing errors in violation of applicable regulations; (5) the Company's internal controls over financial reporting and servicing processes and procedures were not effective; (6) RMS' financial statements were overstated by material amounts and contained false and misleading statements; and (7) the Company overstated the value of the RMS acquisition.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Walter Investments' corporate headquarters are located in this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

22.     Plaintiffs, as set forth in their attached Certifications, purchased Walter Investment securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the corrective disclosures.

23.     Defendant Walter Investment is a Maryland corporation with its headquarters located at 3000 Bayport Drive, Suite 1100, Tampa, Florida. Walter Investment's common stock trades on the NYSE under the ticker symbol "WAC."

24.     Defendant Mark J. O'Brien ("O'Brien") was at all relevant times the Company's Chairman of the Board of Directors and Chief Executive Officer.

25.     Defendant Denmar J. Dixon ("Dixon") was at all relevant times the Company's Vice Chairman and Executive Vice President. Defendant Dixon also had served on the Company's Audit Committee, Nominating and Corporate Governance Committee, and as Chairman of the Compensation and Human Resources Committee.

26.     Defendant Charles E. Cauthen ("Cauthen") was at all relevant times the Company's Chief Operating Officer and Chief Financial Officer until his resignation in October 2013.

27.     Defendant Keith A. Anderson ("Anderson") has served as Walter Investment's Chief Operating Officer since August 2013 and as Green Tree's Chief Executive Officer and President since September 2011.

28.     Defendant Brian Corey ("Corey") has served as Senior Vice President and Chief Compliance Officer for Walter Investment and as Green Tree's Senior Vice President, General Counsel and Secretary during the Class Period.

29.     Defendant H. Marc Helm served as Co-Founder, President, Chief Operating Officer and Chief Executive Officer of Reverse Mortgage Solutions, Inc. at all relevant times until his resignation in December 2013.

30.     The defendants referenced above are sometimes referred to herein collectively as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

31.     Walter Investment grew significantly through acquisitions of mortgage originating and servicing companies during the Class Period, including the acquisition of RMS, Green Tree, as well as large servicing loan portfolios from Bank of America and ResCap.

32.     On July 1, 2011, Walter Investment acquired Green Tree, one of the largest servicers of home loans in the country, specializing in servicing sub-prime residential mortgages (*i.e.*, debt collection of financially stressed home owners). Green Tree is a wholly-owned

subsidiary of Walter Investment. Based in St. Paul, Minnesota, Green Tree operates twenty-nine offices for its debt recovery operations.

33.     On November 1, 2012, Walter Investment acquired Reverse Mortgage Solution, Inc. ("RMS") through a stock purchase agreement. Walter Investment acquired one hundred percent of RMS's stock for total consideration of $120 million—$95 million in cash and 891,265 shares of the Company's common stock. Based in Spring, Texas, RMS originates and services reverse mortgage consumer loans.

34.     In turn, Green Tree acquired the servicing rights for hundreds of thousands of at-risk loans. In January 2013, Bank of America sold its mortgage servicing rights to Green Tree for roughly 650,000 mortgage loans worth $93 billion dollars to Green Tree's parent corporation, Walter Investment. In January 2013, Walter Investment acquired ResCap for approximately $490 million. Walter Investment's acquisitions of these portfolios from ResCap and Bank of America expanded its servicing portfolio by approximately over $120 billion in early 2013 alone—representing almost half of Walter Investment's $250 billion servicing portfolio.

35.     Upon purchasing the ResCap portfolio, Walter Investment and Green Tree became subject to certain compliance metrics established by a joint federal and state settlement with the country's five largest mortgage servicers, including Ally/GMAC, Bank of America, Citi, JPMorgan Chase and Wells Fargo ("2012 National Mortgage Settlement").

36.     The Company touted the financial benefits of the RMS and Green Tree acquisitions, and thereafter made numerous representations concerning the Company's rigorous controls over its servicing and loan operations and strict compliance with applicable state and federal regulations governing its business.  Contrary to these public representations, Defendants knew, or recklessly disregarded, that the Company had inadequate internal controls, including

with respect to its loan servicing operations, and was plagued by widespread violations of consumer laws.

**<u>The Company Was Subject to Extensive Regulation Concerning Its Business Activities</u>**

37.     During the Class Period, the Company was subject to various regulations pertaining to its business, including the Real Estate Settlement Procedures Act of 1974 ("RESPA"), the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Telephone Consumer Protection Act (the "TCPA"), as well as various prohibitions against unfair, deceptive, and abusive practices.

38.     Historically, RESPA has been implemented in Regulation X of the Department of Urban Housing and Development ("HUD"), 24 CFR part 3500.

39.     On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") was signed into law for the express purpose of further regulating the financial services industry, including mortgage origination, sales, servicing and securitization.

40.     The Dodd-Frank Act amended a number of consumer protection laws, including RESPA.  The Act also transferred rule-making authority for RESPA to the CFPB, effective July 21, 2011.  The CFPB officially began operations on that date.

41.     During the Class Period, Walter Investment was subject to the CFPB's regulations implementing portions of the Dodd Frank Act. *See* Real Estate Settlement Procedures Act (Regulation X), 10 C.F.R. § 1024. Servicing errors include several categories as defined by those regulations, including:

- Failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments;

- Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law;

- Failure to credit a payment to a borrower's mortgage loan account as of the date of receipt;

- Failure to pay taxes, insurance premiums, or other charges, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay, in a timely manner or to refund an escrow account balance;

- Imposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower;

- Failure to provide an accurate payoff balance amount upon a borrower's request;

- Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure;

- Failure to transfer accurately and timely information relating to the servicing of a borrower's mortgage loan account to a transferee servicer;

- Making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of § 1024.41(f);

- Moving for foreclosure judgment or order of sale, or conducting a foreclosure sale in violation of § 1024.41(g) or (j); or

- Any other error relating to the servicing of a borrower's mortgage loan.

42.    Regulation X also contains general disclosure requirements, error resolution procedures, requests for information procedures, and forced place insurance requirements governing mortgage servicing.

43.    In addition, as already described above, the Company was subject to certain metrics prescribed by the 2012 National Mortgage Settlement.   The bipartisan settlement provided $25 billion in relief to distressed borrowers and direct payments to signing states and the federal government. The agreement settles state and federal investigations finding that the country's five largest mortgage servicers routinely signed foreclosure related documents outside the presence of a notary public and without knowing whether the facts they contained were correct. The settlement is the largest consumer protection settlement in U.S. history.

**Defendants' Misrepresentations Concerning the Company's Internal Controls and Regulatory Compliance**

44.    Throughout the Class Period, the Company represented that it maintained the highest level of oversight over its servicing protocols and procedures and maintained strict internal controls over its servicing processes and compliance with regulatory and legal requirements. Defendants further represented that they had tight internal controls regarding compliance, including regular audits and extensive quality control procedures. For example, the Company represented it had a "[c]ulture of Compliance: Strong independent controls and processes for monitoring and managing compliance;" and the Company touted its "Compliance – Risk Mitigation: To preserve client brand value, we aggressively maintain compliance with all federal and state requirements and laws. Quarterly audits are conducted to ensure our standards are met."

45.    Similarly, Defendant Anderson stated, "Things like charging fees to customers and handling customer complaints. We don't take any of those things lightly. ***We always want to be well inside the boundaries. We don't want to push any of the boundaries on any of those activities.***"

46.    Defendants consistently made similar representations in its SEC filings and investor presentations consistently throughout the Class Period.

47.    Contrary to these statements, however, the Company engaged in widespread and abusive collection practices and other violations of consumer law as a matter of course. Further, the Company had little or no controls over its servicing operations, leading to widespread consumer law violations and servicing errors.

48. As a result, the Company is now subject to an imminent enforcement action by the CFPB and FTC concerning Green Tree, is under investigation by the HUD concerning RMS, and is the subject of numerous private litigations alleging misconduct.

49. Further, as a result of widespread deficiencies in the Company's servicing practices, including debt collection procedures, Walter Investment was forced to restate RMS' financial results for a two-and-a-half year period due its failure to account for estimated liabilities to investors relating to those very same servicing errors. For the period ended June 30, 2012 alone, RMS restated its liabilities relating to servicing by an increase of $41 million.

***Green Tree's Deceptive and Abusive Collection Practices***

50. During the relevant period, the Company's wholly-owned subsidiary, Green Tree, engaged in widespread, abusive and improper collection procedures.

51. Numerous postings by current and former Green Tree employees reflect complaints that Green Tree fostered a coercive and illegal approach to its collection practices. The following are illustrative examples taken from the employment website indeed.com:

- On April 27, 2013, a former collections employee from Virginia warned, "Worst Collection Company on the face of the earth. Paid to push clients instead of helping them. ***Monthly 'hit or else' goals … no matter what it takes (Call family members/friends to collect depts).*** Sad that a company like this is in business, gives other collection companies/workers a bad name. Stay away!"

- A January 23, 2013 positing by a former collection representative from San Antonio, Texas warned potential employees against working for Green Tree, stating that "management was terrible" and "***would tell you to break the law to hit your bonus.***"

52. Similarly, postings from current and former Green Tree employees on glassdoor.com make similar complaints:

- An April 2, 2014 posting by a current employee from Irving, Texas states that Green Tree has "[a]bsolutely no interest in helping the borrower" but only to "[g]et the numbers, get the money."

- A March 18, 2014 posting by a former front end collections employee from Fredericksburg, Virginia states that Green Tree engages in "unethical collections."

  A December 10, 2013 posting by a former collections specialist for Green Tree in Tempe, Arizona complained about the "[l]ack of meaningful training…" Similarly an October 14, 2013 posting from a former Green Tree manager from Saint Paul, Minnesota complained that Green Tree has "[n]o training of any kind," and no " procedures, workflows, or job aides."

- On July 22, 2013, a former customer service representative from San Antonio, Texas complained about "[high] angry call volume and major customer rip offs."

- A May 14, 2013 posting by a former late stage collector from Tempe, Arizona states that Green Tree encourages employees to berate and humiliate the customers.

- A July 15, 2013 posting by a current employee and debt collector at Green Tree states that Green Tree has no training and that "[t]*hey encourage you to break laws* and to cross the line…."

53.     Numerous lawsuits have been filed by individuals complaining about Green Tree's abusive collection practices. For example, on April 3, 2013, a class action lawsuit was filed in Massachusetts federal court against Green Tree on behalf of a national class seeking redress for violations of the Telephone Consumer Protection Act (the "TCPA"). The complaint alleges that, in violation of the TCPA, Green Tree autodialled the plaintiff's cell phone as many as 100 times a day regarding a debt he did not owe. On May 30, 2014 a plaintiff filed a lawsuit in the Central District of California alleging that holders of her loan note, including Green Tree, violated debt collection laws. On May 30, 2014 a plaintiff filed an action against Green Tree in the Southern District of Florida alleging that it created a home loan modification process filled with complication and obstacles in violation of applicable regulations.

54.     Thousands of customers have lodged consumer complaints against Green Tree specifically complaining of the Company's abusive collection practices, improper loan modifications and improper foreclosure practices. For example, ConsumerAffairs.com had over

1,700 individual complaints lodged against Green Tree for its servicing of consumer loans and an overall one out of five star satisfaction rating among those consumers.[2] Consumers repeatedly cite intimidation, harassment, and totally demeaning treatment Green Tree employees used in their abusive collection efforts. Similarly, a Facebook page entitled "Victims of Green Tree Servicing" has over 1,500 likes and contains numerous consumer complaints. A search for "Green Tree Servicing" on RipoffReport.com, a consumer advocacy website, brings up over 160 similar complaints against the company.

55.    Consumers created a Moveon.org petition entitled, "Investigate the billing and credit reporting practices of Green Tree Mortgage Service, LLC," asking it to "stop the practice of the apparent inaccurate billing and reporting of your customer's payments. Listen to the requests of your customers and make the necessary adjustments in your apparent aggressive accounting tactics." The petition currently has over 1,300 signatures.

56.    The majority of these consumer complaints focus on Green Tree's abusive collection practices, failing to apply payments to mortgage accounts and harassing customers with numerous daily calls for collection, as illustrated by the following examples:

- A July 1, 2014 posting by one consumer complains that Green Tree failed to apply payments to her mortgage account and that she had to engage an attorney to rectify the situation.

- A July 1, 2014 posting by another consumer complains of excessive and unexplained charges imposed by Green Tree, and that Green Tree failed to acknowledge 6 payments made by the consumer on their mortgage from January 2014 to April 2014.  ("we made 6 payments then got a statement saying we hadn't paid anything all year. They declined one payment and went through foreclosure procedures with letters from their lawyer. All of a sudden they dropped it and I'm sure tacked on legal fees for going through the motions. They are nothing but crooks.")

---

[2] *See* Green Tree Consumer Complaints & Reviews, ConsumerAffairs.com, (last visited June 30, 2014), http://www.consumeraffairs.com/finance/greentree.htm.

- A June 29, 2014 posting by another consumer complains of multiple intraday calls from Green Tree ("6 to 7x a day"), the refusal to accept and process payments made by this consumer, and a questionable increase in monthly fees. The consumer described its customer service as "horrific".

- A June 27, 2014 posting by another consumer complained that even though he was a "'perfect pay' customer, with no late payments," Green Tree began repeatedly calling him, threatening his credit and telling him that Green Tree had "changed" his escrow without warning and that he was now in arrears for $106 dollars. The consumer further explained that Green Tree claimed to have sent an escrow analysis but that it was never received.

57.     Green Tree's abusive and unscrupulous practices are now the subject of several government investigations. The Company stated that Green Tree had been under government investigation since 2010 in its year-end 2011 Form 10-K dated March 3, 2012, but it insisted that its practices were legal:

> In November 2010, the Federal Trade Commission, or FTC, issued a Civil Investigation Demand, or CID, to an unknown number of mortgage servicers, including Green Tree, requesting information on a broad range of subjects relating to the companies' operations. In November 2011, Green Tree received a Supplementary Discovery Request from the FTC seeking additional information. The Company has, and will continue to cooperate with the FTC and ***does not believe that it has violated in any material respect any laws or regulations***.

58.     On November 6, 2013, the Company announced that CFPB staff was considering recommending that the agency take action against Green Tree for violations of various consumer financial laws.

59.     On February 27, 2014, in a Form 8-K filed with the SEC, the Company announced that, as a result of information provided by the Company to regulatory authorities relating to its mortgage servicing operations, the FTC and CFPB, had, in fact, sought authority to bring an enforcement action related to violations of federal consumer financial laws.

60.     Further evidence of the Company's compliance failures is a report issued by the Office of the Mortgage Settlement Oversight on May 14, 2014, which concluded that Green Tree failed 8 out of 28 basic compliance metrics relating to its servicing of the loan portfolio that it

acquired from ResCap. This report made clear that the Company did not have the most elementary of controls over servicing processes as required by applicable regulations. Specifically, Green Tree failed the following metrics: (1) Green Tree failed to accurately state amounts due from borrowers in proofs of claims filed in bankruptcy proceedings; (2) Green Tree failed to  accurately state amounts due from borrowers in affidavits filed in support for relief from stay in bankruptcy proceedings; (3) Green Tree failed to provide borrowers with accurate information in pre-foreclosure letters; (4) Green Tree failed to provide borrowers with required notifications no later than 14 days prior to referral to foreclosure; (5) Green Tree failed to waive post-petition fees, charges or expenses when required by the settlement; (6) Green Tree did not have documented policies and procedures in place to oversee third-party vendors; (7) Green Tree failed to respond to government submitted complaints and inquiries from borrowers within 10 business days and provide an update within 30 days; and (8) Green Tree failed to notify borrowers of any missing document in loan modification applications within five days of receipt.

61.    On June 6, 2014, Fitch, one of the country's largest credit rating agencies, placed Green Tree on negative watch following the report of the Office of the Mortgage Settlement Oversight, citing to "ongoing concerns with Green Tree's rapid growth and portfolio performance."

**Defendants' Misrepresentations Concerning the RMS Acquisition**

62.    In September, 2012, the Company announced its acquisition of Reverse Mortgage Solution, Inc. ("RMS") through a stock purchase agreement, for total consideration of approximately $120 million.  On October 15, 2012, the Company filed a Form 8-K which attached and incorporated by reference RMS's financial statements for 2010 and 2011, as well as unaudited financial statements for the period ended June 30, 2012.

63.     The Company touted the strong financial picture presented by the RMS acquisition and its accretive financial value to the Company.  For instance, in a September 4, 2012 presentation to investors, the Company stated that the RMS deal was "[i]mmediately accretive to Walter Investment stand-alone earnings."

64.     On March 19, 2013, however, the Company suddenly admitted that it had a "material weakness" in its controls, and as a result had incorrectly capitalized the $4.7 million material arrangement fee paid to its investment bankers in association with the RMS acquisition. The Company's Form 10-K filed that day with the SEC stated:

> We have determined that there is a material weakness in our controls. This material weakness resulted in one material adjustment related to the improper capitalization of certain third party costs paid to our investment bankers as arrangement fees associated with the Company's fourth-quarter 2012 debt modification, which was corrected prior to the issuance of the Company's consolidated financial statements and several individually immaterial adjustments. As a result of this material weakness, management has concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our internal control over financial reporting was not effective.

65.     Then, on June 6, 2013, the Company filed a Form 8-K with the SEC announcing another material and previously undisclosed adverse fact regarding RMS, namely, that Walter had discovered "a failure to record certain estimated liabilities to investors relating to servicing errors by RMS," and that as a result, the RMS financial statements (previously filed by the Company with its October 15, 2012 Form 8-K) should no longer be relied upon.  Specifically, the Company disclosed:

> ***Federal Housing Administration ("FHA") regulations provide that servicers meet a series of event-specific timeframes during the default, foreclosure, conveyance, and mortgage insurance claim cycles. Failure to timely meet any processing deadline may stop the accrual of debenture interest otherwise payable in satisfaction of a claim under the FHA mortgage insurance contract and the servicer may be responsible for making the investor whole for any interest curtailment due to not meeting the required event-specific timeframes.***

17

Although the Company has not determined the full effect of these matters and is completing its review thereof, on May 31, 2013, based on preliminary conclusions after discussions with RMS' historical independent registered public accounting firm, management of the Company concluded that the RMS Historical Financial Statements, and the related report of RMS' historical independent registered public accounting firm, should no longer be relied upon, and should be restated to reflect the error described above. The Company has determined that the error is material to the balance sheets and income statements included in the RMS Historical Financial Statements, but has no material effect on the statements of cash flows. In addition, management has concluded that the combined pro forma financial information previously filed with the affected 8-Ks should no longer be relied upon.

66.     On September 24, 2013, the Company filed restated financial statements for RMS.  As evidenced in the restated financial results filed by the Company on September 24, 2013 on Form 8-KA with the SEC, as of June 30, 2012, RMS' liabilities relating to servicing errors increased by $41 million, retained earnings decreased by $26 million, and stockholders' equity decreased $26 million; as of December 31, 2011, liabilities increased by $35 million, retained earnings decreased by $22 million, and stockholders' equity lost $4 million; as of December 31, 2010, liabilities increased by $20 million, retained earnings decreased by $12 million, and stockholders' equity lost $12 million.

67.     Only days after the restatement, on October 3, 2013, the Company announced the resignation of its Executive Vice President and Chief Financial Officer, Charles Cauthen.

68.     The impact of the material servicing errors and other restated financial results evidence that the RMS acquisition was far less valuable than Defendants had previously represented.  Further, the restatement was symptomatic of the Company's repeated and matter-of-course failure to meet regulatory servicing requirements. Consumer protection laws strictly govern servicing of consumer loans and collection practices of companies like Walter Investment.  Defendants knew that violating these applicable regulations would risk prosecution by federal and state agencies. Despite their knowledge with respect to the Company's dismal

compliance efforts and inadequate internal controls, Defendants continually touted the Company's strong controls regarding compliance with applicable regulations.

69.    In fact, as with the Green Tree operations, RMS is now also under government investigation.  On November 6, 2013, approximately one year after the RMS Acquisition, the Company announced its receipt of a subpoena from the HUD Office of Inspector General, which is charged with directly overseeing the FHA and its activities, "requesting documents and other information concerning (i) the curtailment of interest payments on HECM loans serviced or sub-serviced by RMS and (ii) RMS' contractual arrangements with a third party vendor for the management and disposition of real estate owned properties."

**The Company's Inadequate Internal Controls**

70.    Defendants had the responsibility to present the Company's business activities in accordance with § 13 of the Exchange Act, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -
>
> A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>      i. transactions are executed in accordance with management's general or specific authorization;
>      ii. transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
>      iii. access to assets is permitted only in accordance with management's general or specific authorization; and
>      iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

71.     Yet, throughout the Class Period, the Company's internal controls and financial reporting was in shambles—necessitating disclosure of material weaknesses in its internal controls.

72.     First, the Company disclosed a material weakness in its financial reporting with respect to the value of the RMS acquisition. In a March 19, 2013 fourth quarter 2012 earnings conference call, Walter Investment's Chief Accounting Officer, Kimberly Perez, explained, "While we had many successes in 2012, I would like to comment on one item contained in the 10-K that is not indicative of the standards we strive to maintain. We noted that we had a material weakness in certain of our internal controls related to the significant increase in our acquisitions and related transactions in the fourth quarter of 2012. This issue manifested itself in the form of an incorrect capitalization of an arrangement fee paid to our investment bankers associated with our fourth-quarter refinancing. This item, which totaled $4.7 million, was detected by our auditors and corrected before we reported our results."

73.     Moreover, as demonstrated by the Company's repeated violation of consumer protection regulations as a course of business, the Company had inherent weaknesses in internal controls with respect to its loan servicing processes and procedures. These material internal control weaknesses contributed to the Company's issuance of materially false and misleading financial statements throughout the Class Period.

**FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

74.     On May 9, 2012, the Company filed with the SEC on Form 10-Q, signed by Defendants O'Brien and Cauthen, its quarterly report for the period ending March 31, 2012. The Company reported $57.1 million in cash and cash equivalents, $2.27 billion in residential loan assets, and loan receivables of $228.59 million net. The Company also reported total revenues of

$165.7 million, total expenses of $162.2 million and net income of $5.1 million, or $0.17 diluted earnings per share. The 10-Q stated, "Additionally, we completed the transition of servicing the residential loans that are held in the Residual Trusts, as well as, unencumbered loans to Green Tree, which resulted in modification to internal controls over the Servicing, Foreclosure and Real Estate Owned, and Accounting business processes." In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants O'Brien and Cauthen stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.[3]

75.     On May 9, 2012, Walter Investment issued its First Quarter 2012 Earnings Presentation to investors, which touted its "servicer rating affirmed or upgraded" and "culture of compliance – strong independent controls and processes for monitoring and managing compliance."

76.     On June 5, 2012, the Company issued its presentation at the Keefe, Bruyette & Woods Mortgage Finance Conference to investors. The presentation touted the Company's "active portfolio management – to improve servicing, regulatory compliance and credit performance," "grounded in the long-term value proposition we offer clients for improved credit performance and regulatory compliance," and "proven track record as a high-quality manager of whole loans."

77.     On August 9, 2012, the Company filed with the SEC on Form 10-Q, signed by Defendants O'Brien and Cauthen, its quarterly report for the period ending June 30, 2012. The Company reported $38.3 million in cash and cash equivalents, $2.24 billion in residential loan

---

[3] According to the Company's own SEC filings, "[t]he terms 'Walter Investment,' the 'Company,' 'we,' 'us' and 'our'" "refer to Walter Investment Management Corp. and its consolidated subsidiaries," including Green Tree.

assets, and net loan receivables of $225.7 million. The Company also reported total revenues of $164.1 million, total expenses of $164.1 million and net income of $428,000 or $0.01 diluted earnings per share. In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants O'Brien and Cauthen stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

78.     On August 9, 2012, Walter Investment issued its Second Quarter 2012 Earnings Presentation to investors, which touted the Company's "differentiated servicing model: platform continues to deliver results that exceed clients' expectations" and "culture of compliance: regulatory compliance capabilities remain at the 'top of the list' in terms of ability to win new business."

79.     In an earnings call held on August 9, 2012, Defendant O'Brien stated:

We have a solid platform with distinct advantages that afford our shareholders a great vehicle for which to participate and a significant growth opportunity within the mortgage servicing sector. We continue to execute for our clients by delivering strong portfolio performance in a regulatory-compliant matter.

80.     During the same call, Defendant Cauthen stated, in response to a question concerning an investigation into force-placed insurance:

Where we stand on it simply is we were subject to a couple of requests for information or subpoenas, or whatever they were called, the New York Department of Banking and Financial Regulation, whichever group that is, was the most notable one. We've provided all that information and have had no further discussions or contact or questions. Any other regulatory authorities that request information, we are cooperative and we provide it, because we're very comfortable and confident that our business practices meet all the requirements out there. You can go through the CFPB's examination manual or any of the other information you might read publicly about what best practices are in this business and we follow those very, very stridently.

81.     On that same day, August 9, 2012, Walter Investment issued a press release which quoted Defendant O'Brien, who stated, "We continue to exceed our clients' expectations for performance on serviced portfolios and are seeing operational improvements in our Loans & Residuals segment and our ARM business. Based on our continued track record of performance, as well as the significant amount of new business opportunity in the market and in our pipeline, we expect to see continued strong performance and results in the second half of this year."

82.     The statements referenced in ¶¶ 74-81 above, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that: (1) the Company had inadequate and lax compliance controls, and was not in compliance with respect to applicable legal and regulatory schemes; and (2) the Company's business practices  violated consumer protection laws repeatedly and jeopardized the Company's revenues and profits.

83.     On September 4, 2012, Walter Investment announced its acquisition of RMS, emphasizing the excellent value proposition of the acquisition. The Company's presentation stated that the RMS "purchase price as a multiple of 2012E EBITDA is at an attractive level of 2.6X," RMS "string earnings and EBITDA generation" and "strong earnings accretion and a solid return on invested capital well in excess of our cost of capital."

84.     That same day, September 4, 2012, the Company issued a press release describing the RMS purchase:

> Walter Investment Management Corp. (NYSE MKT: WAC) ("Walter Investment" or the "Company") today announced that it has entered into a definitive agreement to purchase Reverse Mortgage Solutions, Inc. ("RMS") in a transaction valued at $120.0 million. Consideration in the transaction consists of $60.0 million of cash, $25.0 million of WAC stock and a $35.0 million seller MSR note. The Company anticipates the acquisition of RMS will be significantly accretive to both earnings and cash flow, and estimates that, on a pro forma basis, the acquisition would have been accretive to 2012 core earnings per share by

approximately 25% had the acquisition been completed at the beginning of this year. The $120.0 million transaction value represents a multiple of approximately 2.6x RMS' expected 2012 EBITDA, or 4.1x its 2012 expected core earnings.

85.     The Company August 6, 2012 Form 8-K, filed with the SEC, further explained

the terms of the RMS acquisition:

> Walter Investment Management Corp. (the "Company") has entered into a Stock Purchase Agreement, dated as of August 31, 2012 (the "Purchase Agreement"), by and among the Company, Reverse Mortgage Solutions, Inc. ("RMS").
>
> Under the terms of the Purchase Agreement, the Company (through an assignee that will be a newly formed, wholly owned subsidiary of the Company ("Buyer")) will acquire 100% of the stock of RMS for aggregate consideration of $120 million (net of transaction expenses in excess of $1.5 million, which shall be borne by the Sellers) that will be paid at closing (the "Closing") in the form of $60 million in cash, $35 million aggregate principal amount of secured notes of Buyer (the "MSR Notes") and 891,265 shares of Company common stock (the "Stock Consideration"). The Stock Consideration is valued at $25 million based on the average closing price of $28.05 per share as reported on the New York Stock Exchange Composite Transaction Tape for the period from August 20, 2012 through August 30, 2012. The source of the cash consideration will be cash on hand and borrowings under the Company's existing credit facilities.

86.     On October 15, 2012, the Company filed a Form 8-K with the SEC, attaching

RMS's financial statements, including: RMS' Consolidated Financial Statement for the years

ended December 31, 2011 and 2010; RMS' Consolidated Unaudited Financial Statements for the

period as of June 30, 2012; and RMS' Unaudited Pro Forma Condensed Combined Financial

Information as of June 30, 2012.

87.     On November 7, 2012, the Company announced in a press release, and in a Form

8-K filed with the SEC, that it had completed its acquisition of RMS for consideration of

approximately $120 million, $95 million of which was cash consideration, and the remainder of

which was paid for with 891,265 of the Company's shares. The 8-K stated:

> On November 1, 2012 (the "Closing Date"), pursuant to the Stock Purchase Agreement, dated as of August 31, 2012 (such previously announced Stock Purchase Agreement, as amended or modified, the "Purchase Agreement"), by and among Walter Investment Management Corp. (the "Company"), Reverse

Mortgage Solutions, Inc. ("<u>RMS</u>"), JAM Special Opportunities Fund, L.P., as a stockholder seller and as the sellers' representative ("<u>JAM</u>"), and the other stockholder sellers listed on the signature pages thereto (together with JAM, the "<u>Sellers</u>"), the Company completed (the "<u>Closing</u>") its previously announced acquisition (the "<u>Acquisition</u>") of RMS from the Sellers.

Pursuant to the terms of the Purchase Agreement, the Company (through Walter Reverse Acquisition LLC, an indirect, wholly owned subsidiary of the Company) acquired 100% of the stock of RMS for aggregate consideration of approximately $120 million. The cash consideration for the Acquisition was netted against approximately $3.1 million of certain transaction expenses in excess of the $1.5 million borne by the Sellers.

88.    The consideration paid by the Company was in the form of $95.0 million in cash and 891,265 shares of the Company's common stock, par value $0.01 per share (the "<u>Stock Consideration</u>"). The Stock Consideration was valued for purposes of the Purchase Agreement at approximately $25.0 million based on the average closing price of $28.05 per share as reported on the New York Stock Exchange Composite Transaction Tape for the period from August 20, 2012 through August 30, 2012. Payment of the cash consideration was made from cash on hand.

89.    The statements referenced in ¶¶ 83-87 above, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that: (1) RMS' financial statements were overstated by material amounts and contained false and misleading statements; (2) the Company had failed to disclose material weaknesses in its internal controls; and (3) the Company had overstated the value of the RMS acquisition.

90.    On September 11, 2012, Defendants presented at the 2012 Investor and Financial Analyst Day at the Arizona Grand report in Phoenix, Arizona. According to the agenda, the presentation included remarks by each of the Individual Defendants—Defendant O'Brien gave the opening remarks and closing comments; Defendant Dixon gave the Company's strategic

overview; Defendant Anderson gave a Green Tree overview; and Defendant Corey gave a regulatory overview. In that presentation, Defendant Anderson stated:

> As many of you know, the loan servicing business is highly regulated. There's a lot of things that you can do wrong if you don't dot the i's and cross the t's, that's why we put so much emphasis on our day-to-day activities of compliance. It is the fundamental framework of how we do business today, is to stay well within the boundaries of how you do business. Things like charging fees to customers and handling customer complaints. We don't take any of those things lightly. We always want to be well inside the boundaries. We don't want to push any of the boundaries on any of those activities. So where there's opportunities to make another $0.05 or $0.10 and some fee opportunities and we don't see that it's well-defined within state regulatory requirements, we're going to pass on that. We're going to leave that money aside because we're more comfortable managing in a tighter box.

91.     In that same presentation, Green Tree's general counsel and head of its compliance department, Defendant Corey, stated:

> So that's what's happened currently on the federal side. On the state and the local side, there's a continued enactment of new loan servicing laws at a heightened pace. More than 30 states have passed over 48 laws so far this year. So that leads to the question, I would think, how do you guys stay abreast of all these changes? And the next slide describes that, that we have a rapidly evolving regulatory environment. We need to identify, analyze and implement these new requirements and restrictions.
>
> The way we do that is by utilizing resources that we've used for many years that are broad-ranging in scope to become aware of law changes. We review and analyze the new laws in-house and consult with outside regulatory counsel for certain questions to get advice and guidance. We create charts that compare each new requirement or restriction to our existing practice. So to give you an idea, and I'm just kind of a visual prompt here, but for the CFPB regulation, and this is our chart that we've prepared where we've gone through each of them, and then what are the requirements and what is our existing practice? Is it consistent or not? And if it's not, what do we need to do to come into a consistent position?
>
> We do that with a lot of changes. We also do it with regulatory actions that may be brought throughout the industry against competitors. ***It's a way for us to analyze what's happening and how we can promptly and accurately come into compliance. How do we do that? We hold regularly scheduled meetings with senior management at least monthly where we review law changes and go through implementation to make sure that we remain on track. Next, we prepare policies and procedures, forms and employee alerts, and all of those are***

*reviewed by the compliance department before they're implemented. The organization conducts employee training, when appropriate, on law changes, and then we perform post-implementation audits and quality control.*

92.     A slide presentation presented by the Defendants on Walter Management letterhead at the September 11, 2012 Investor and Financial Analyst Day further represented that the Company had the following:

- Culture of Compliance: Strong independent controls and processes for monitoring and managing compliance.

- Green Tree has the necessary independent control and processes to mitigate risk. This is monitored through: Legal and Compliance Departments; Internal Audit; Quality Control; Call Monitoring; Policy and Procedures.

- These controls and functions exist to mitigate regulatory, litigation, reputational and financial risks.

93.     The presentation highly touted Green Tree's internal controls and monitoring:

## Independent Controls and Monitoring



The presentation further represented:

- Compliance – Risk Mitigation: To preserve client brand value, we aggressively maintain compliance with all federal and state requirements and laws. Quarterly audits are conducted to ensure our standards are met.

- All third-party agents (e.g. collection agencies and attorneys) are required to complete a rigorous due diligence process.

- Third-party score cards are used to ensure consistent performance, quality, and compliance, and are maintained over time.

- Risk Mitigation: Leverages Green Tree's compliant and secure infrastructure, ensuring compliance risk is minimized; Customer Service and compliance-based collections approach to mitigate "headline risk;" Collector and supervisor incentives ties to compliance requirements.

- GT ARM Customer-Centric Approach: Respect, Teamwork, Prudence, Responsiveness, Integrity, Fairness, Accountability, Dignity, Performance-Oriented.

- Green Tree's demonstrated capabilities, both in Credit Performance and Compliance with Industry Regulations, positions us well for future growth.

94.    On November 8, 2012, Walter Investment issued its Third Quarter 2012 Earnings Presentation to investors, which touted the Company's "differentiated servicing model: high level of compliance drives preferred partner status."

95.    The statements referenced in ¶ 90-94 above were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that: (1) the Company had inadequate and lax compliance controls, and was not in compliance with respect to applicable legal and regulatory schemes; (2) the Company's business practices violated consumer protection laws repeatedly and jeopardized the Company's revenues and profits; and (3) the Company ignored repeated servicing errors in violation of applicable regulations.

96.     On January 17, 2013, the Company filed an amended Form 8-K, in order to report

pro-forma financial information relating to the RMS acquisition previously disclosed by the

Company.  The Company stated the following:

> On September 6, 2012, Walter Investment Management Corp. (the "Company")
> filed a Current Report on Form 8-K, reporting, among other things, that pursuant
> to the terms of a Stock Purchase Agreement, dated as of August 31, 2012 (as
> amended), by and among the Company, Reverse Mortgage Solutions, Inc.
> ("RMS"), JAM Special Opportunities Fund, L.P., as a stockholder seller and as
> the sellers' representative, and the other stockholder sellers listed on the signature
> pages thereto, the Company would acquire all of the outstanding stock of RMS
> (the "Acquisition"). On November 7, 2012, the Company filed a Current Report
> on Form 8-K (the "Original Form 8-K"), reporting that the Acquisition had closed
> on November 1, 2012 and, incorporating by reference from the Company's
> Current Report on Form 8-K filed on October 15, 2012, the audited consolidated
> balance sheets of RMS as of December 31, 2011 and 2010, and the related
> consolidated statements of operations, changes in stockholders' equity and cash
> flows for the years ended December 31, 2011 and 2010 and the unaudited
> consolidated balance sheets of RMS as of June 30, 2012 and December 31, 2011,
> and the related consolidated statements of operations and cash flows for the six
> months ended June 30, 2012 and 2011 and the consolidated statement of changes
> in stockholders' equity for the six months ended June 30, 2012.

> As permitted under Item 9.01 of Form 8-K, the Company indicated in the Original
> Form 8-K that it would file the financial statements and pro forma financial
> information required under Item 9.01 of Form 8-K within 71 calendar days after
> the date on which the Original Form 8-K was required to be filed. This
> Amendment No. 1 on Form 8-K/A amends the Original Form 8-K to include the
> required financial statements and pro forma financial information.

97.     The January 17, 2013 Amended Form 8-K incorporated by reference the

unaudited financial results for RMS as of September 30, 2012.

98.     The statements referenced in ¶ 96-97 above, were materially false and/or

misleading because they misrepresented and failed to disclose the following adverse facts, which

were known to Defendants or recklessly disregarded by them that: (1) RMS' financial statements

were overstated by material amounts and contained false and misleading statements; (2) the

Company had failed to disclose material weaknesses in the internal controls of RMS; (3) RMS'

financials understated the Company's servicing liabilities; and (4) the Company had overstated the value of the RMS acquisition.

99.    In a March 19, 2013 fourth quarter 2012 earnings conference call, Defendant O'Brien stated, "In the servicing business, we have added significant additional product capabilities and clearly added scale. We have achieved this while maintaining high standards of performance and compliance across the entire platform."

100.    In a March 26, 2013 2012 year-end earnings presentation to investors, Defendants represented that it "[r]educed CDR [Cohort Default Rates] through improved servicing performance" and its "2013 Base Performance and Earnings Drivers" included "Servicing performance; CDR Reduction; Highly efficient transfers."

101.    In a May 9, 2013 first quarter 2013 earnings presentation, Defendants represented that the Company's "[h]igh level of compliance drives preferred partner status."

102.    On May 10, 2013, the Company filed with the SEC on Form 10-Q, signed by Defendants O'Brien and Cauthen, its quarterly report for the period ending March 31, 2012. The Company reported $624.7 million in cash and cash equivalents, $9.5 billion in residential loan assets, and net loan receivables of $260.4 million. In addition, the Company included two new line items in its consolidated balance sheet, servicer and protective advances of $364.1 million, and servicing rights and related intangible assets of $964.7 million. The Company also reported total revenues of $291.8 million, total expenses of $280.8 million and net income of $27.7 million or $0.74 diluted earnings per share. The Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants O'Brien and Cauthen stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

103.   At a June 12, 2013 Morgan Stanley Financials Conference, Defendants represented that the Company's "[h]igh level of compliance drives preferred partner status."

104.   On August 8, 2013, the Company issued a press release announcing the Company's second quarter 2013 financial results. The press release quoted Defendant O'Brien as stating, "Our core Servicing segment continued to deliver solid growth in profits and exceptional operational performance from both existing and recently acquired portfolios of new business."

105.   That same day, August 8, 2013, the Company issued its Second Quarter 2013 Earnings Presentation to investors, which touted the Company's servicing business. Specifically, it stated: "[h]igh level of compliance drives preferred partner status;" "[r]eceived servicer rating upgrades from Fitch Ratings, making Green Tree top rated specialty servicer;" "[s]ervicing segment achieved exceptional results while boarding 552,000 accounts, lowering GSE first-lien delinquencies by 126 bps and growing incentive and performance based fees 83% as compared to the prior year period;" "*[s]ervicing: Delinquency improvements driven by the business model improve profitability*."

106.   On September 24, 2013, in a presentation at the Barclays Global Financial Services Conference, Defendants represented that the Company "[r]eceived servicer rating upgrades from Fitch Ratings, reinforcing Green Tree's top rated specialty servicer status" and with respect to "[s]ervicing: Delinquency improvements driven by the business model improve profitability."

107.   The statements referenced in ¶ 99-106 above were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that: (1) the Company had inadequate and lax compliance controls, and was not in compliance with respect to applicable

legal and regulatory schemes; (2) the Company's business practices violated consumer protection laws repeatedly and jeopardized the Company's revenues and profits; and (3) the Company ignored repeated servicing errors in violation of applicable regulations.

## THE TRUTH EMERGES

108.   On March 18, 2013, the Company shocked investors by disclosing that, based on an evaluation by the Company's Board of Directors and management, "our management, including our Chief Executive Officer and our Chief Financial Officer, has identified a material weakness in our internal control over financial reporting. As a result of this material weakness, management has concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our internal control over financial reporting was not effective." The material weakness in internal controls related to improper capitalization of third party costs paid to investment bankers with respect to the RMS acquisition.

109.   On this news, the Company's shares fell $8.61 per share to close on March 19, 2013 at $32.98 per share, a drop of over 20%.

110.   On June 6, 2013, the Company disclosed that it had failed to record estimated liabilities relating to RMS's servicing errors. The Company reported that RMS' financial statements and the Company's "Affected 8-Ks" could no longer be relied upon and that the error was material to the RMS balance sheets and income statements.

111.   On September 24, 2013, the Company restated RMS' financial results, filed on on Form 8-K with the SEC, which indicated that it materially understated liabilities with respect to servicing errors. As of June 30, 2012, liabilities increased by $41 million; as of December 31, 2011, liabilities increased by $35 million; and as of December 31, 2010, liabilities increased by $20 million.

112.    On October 3, 2013, just days after the restatement, the Company announced the resignation of its Executive Vice President and Chief Financial Officer, Charles Cauthen.

113.    Shortly thereafter, on November 6, 2013, the Company filed with the SEC on Form 10-Q, signed by Defendants O'Brien and Cauthen, its quarterly report for the period ending September 30, 2013. The Company announced:

> On October 2, 2013, the Company received a subpoena from the HUD Office of Inspector General requesting documents and other information concerning (i) the curtailment of interest payments on HECM loans serviced or sub-serviced by RMS and (ii) RMS' contractual arrangements with a third party vendor for the management and disposition of real estate owned properties. The Company is responding to the subpoena and at this stage does not have sufficient information to make an assessment of the outcome or impact of HUD's investigation.
>
> In response to a Civil Investigative Demand, or CID, from the Federal Trade Commission, or FTC, issued in November 2010 and a CID from the Consumer Financial Protection Bureau, or CFPB, in September 2012. Green Tree has produced documents and other information concerning a wide range of its operations. On October 7, 2013, the CFPB notified Green Tree, that the CFPB's staff is considering recommending that the CFPB take action against Green Tree for alleged violations of various federal consumer financial laws. Because the Company has not been provided with any specific information as to the nature of any alleged violations, the Company does not have sufficient information to make an assessment of the existence, nature, outcome or impact of any such violations.

114.    On this news, on November 7, 2013, the Company's shares fell $2.51 per share to close at $33.41.

115.    On the morning of February 27, 2014, the Company announced in a Form 8-K filing that FTC and CFPB staff were seeking authority to bring an enforcement against Green Tree:

> On October 7, 2013, the CFPB notified Green Tree, that the CFPB's staff is considering recommending that the CFPB take action against Green Tree for alleged violations of various federal consumer financial laws. On February 20, 2014, the FTC and CFPB staff advised Green Tree that it has sought authority to bring an enforcement action and negotiate a resolution related to alleged violations of various federal consumer financial laws.

116.    In a conference call with investors on February 27, 2014, Defendant Dixon explained the timing of the CFPB investigation:

> While I'm on regulatory matters, let me provide a brief update on our previously disclosed FTC-CFPB investigation. As you may recall, this inquiry began over 3 years ago. We were notified in October of last year that they were considering recommending an enforcement action. ***We were notified last week that they are now recommending an action and will seek approvals to proceed.*** We expect that process to take 30 days or so, at which time we should then receive more specific information regarding the inquiry. As we've consistently stated, we are very proud of the servicing standards we maintain, our excellent servicer ratings and track record of compliance. As we are provided more detail, we will address the facts on an expeditious manner and look to resolve the matter.

Even while disclosing the investigation and enforcement action, Defendant O'Brien inexplicably continued to tout the Company's regulatory compliance and servicing practices:

> By all accounts, 2013 was an exceptional year for Walter Investment. We achieved the goals laid out in our strategic plan and produced strong financial and operating results in this transformational year, while ensuring that our value-added business model retain -- ***remain dedicated to serving the needs of our customers without sacrificing our strong track record of regulatory compliance***. To this end, we received upgrades or reaffirmations of our superior service ratings from S&P, Moody's, Fitch during the year, and we're awarded a 4-star service rating by Fannie Mae, all in the year when we boarded 1 million accounts.
>
> We deliberately grew our servicing portfolio with a focus on maintaining our historically high level of compliance and performance. We did this in asset transactions that were structured to limit assumed liabilities and risks. In February, we launched our originations segment, successfully growing that business from a standing start to capitalize on the HARP opportunities embedded in the ResCap and Bank of America portfolios acquired in early 2013. We helped 63,000 customers access affordable refinancing and funded approximately $16 billion of loans during the year.

117.    On this news, shares of Walter Investment fell from $28.28 to $25.90, more than 8%, on unusually heavy trading volume, on February 27, 2014.

## ADDITIONAL *SCIENTER* ALLEGATIONS

118.    As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Walter Investment, their control over, and/or receipt of modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary

information concerning Walter Investment, participated in the fraudulent scheme alleged herein. In addition, Defendants' knowledge included awareness of the existence of pervasive regulatory compliance issues, accounting issues and material weaknesses which resulted in materially inaccurate reported financial results.

119. During the Class Period, the Individual Defendants ran Walter Investment as "hands-on" managers, oversaw Walter Investment's operations and finances, and made the materially false and misleading statements described herein. The Individual Defendants were intimately knowledgeable about all aspects of Walter Investment's financial and business operations.

120. The Individual Defendants knew, or recklessly, disregarded, the material adverse facts concerning the servicing violations and other legal violations that plagued RMS and Green Tree.

121. Defendant Helm, as Chief Executive Officer of RMS, controlled RMS's operations and financial reporting, and was responsible for the RMS financial statements that were included in the Company's Form 8-K filing dated October 15, 2012, which were materially inaccurate and necessitated a restatement.

122. RMS and Green Tree constituted a substantial source of revenue streams for the Company, and were a core operation of its business, including the servicing of loans. In fact, after the Green Tree acquisition, the servicing portfolio represented the most significant portion of the Company's revenue base.

123. The Individual Defendants received daily reports and had access to computerized information regarding servicing requirements, disclosures, processes and errors, internal controls, financial results and the valuation of acquisitions. The Individual Defendants also were

involved in deciding which disclosures would be made by the Company. Indeed, as already detailed, the Individual Defendants made various public statements during the Class Period that specifically addressed the Company's internal control processes and compliance with applicable regulations. Certain of the Individual Defendants also signed Walter Investment's filings with the SEC during the Class Period, including certificates filed pursuant to the Sarbanes-Oxley Act of 2002 stating the financial reports were accurate and complied with GAAP.

124.    Green Tree is a wholly-owned subsidiary of Walter Investment. The Company held investor conferences at which management from both companies presented on the operations. Presentations concerning Green Tree and RMS were presented on Walter Investment letterhead. When Walter Investment acquired Green Tree in 2011, it stated that "[Walter Investment] management will be responsible for public company functions, [Walter Investment] portfolios, strategy and corporate development, and assistance to and oversight of Green Tree."

125.    In addition, Walter Investment and Green Tree have overlapping management members. Specifically, Brian Corey served as Senior Vice President and Chief Compliance Officer for Walter Investment and as Senior Vice President, General Counsel and Secretary for Green Tree. Keith Anderson has served as Walter Investment's Chief Operating Officer since August 2013 and as Chief Executive Officer and President of Green Tree since September 2011. Cheryl Collins served as Walter Investment's Senior Vice President and Treasurer and also held positions as Assistant Controller, Assistant Treasurer and Treasurer at Green Tree.

126.    Furthermore, during the Class Period, while the Company's share price was artificially inflated due to Defendants' materially false and misleading statements and omissions, Company insiders engaged in insider trading in Company stock, improperly benefitting from

their misrepresentations to investors by selling Walter Investment common stock, as shown in the following chart:

**INSIDER SELLING DURING THE CLASS PERIOD**

| Filer | Transaction Date | Shares | Dollar Price From | Market Value |
|---|---|---|---|---|
| Anderson, Keith A. | 9/6/2013 | 15,857 | $40.00 | $634,280 |
| Anderson, Keith A. | 11/4/2013 | 882 | $36.13 | $31,868 |
| Anderson, Keith A. | 11/4/2013 | 3,038 | $36.65 | $111,343 |
| Anderson, Keith A. | 11/4/2013 | 2,820 | $36.92 | $104,114 |
| Anderson, Keith A. | 11/5/2013 | 1,609 | $35.55 | $57,200 |
| Anderson, Keith A. | 11/5/2013 | 1,651 | $35.84 | $59,178 |
| | **TOTAL** | **25,857** | | **$997,984** |
| | | | | |
| Cauthen, Charles  E. | 5/22/2012 | 3,500 | $18.45 | $64,586 |
| Cauthen, Charles  E. | 5/22/2012 | 3,500 | $18.45 | $64,586 |
| Cauthen, Charles  E. | 5/22/2012 | 11,930 | $18.05 | $215,337 |
| Cauthen, Charles  E. | 1/7/2013 | 8,701 | $47.46 | $412,932 |
| Cauthen, Charles  E | 12/5/2013 | 1,900 | $37.59 | $71,421 |
| Cauthen, Charles  E | 12/5/2013 | 12,168 | $37.74 | $459,220 |
| Cauthen, Charles  E | 12/6/2013 | 8,765 | $37.75 | $330,879 |
| Cauthen, Charles  E | 12/6/2013 | 31,535 | $37.81 | $1,192,181 |
| | **TOTAL** | **81,999** | | **$2,811,140** |
| | | | | |
| Corey, Brian F. | 5/16/2013 | 9,920 | $38.83 | $385,194 |
| Corey, Brian F. | 11/4/2013 | 4,884 | $36.95 | $180,464 |
| Corey, Brian F. | 11/4/2013 | 2,552 | $36.12 | $92,183 |
| | **TOTAL** | **17,356** | | **$657,841** |
| | | | | |
| Dixon, Denmar J. | 1/23/2013 | 19,700 | $45.95 | $905,215 |
| Dixon, Denmar J. | 1/23/2013 | 6,927 | $46.67 | $323,283 |
| Dixon, Denmar J. | 1/24/2013 | 13,993 | $46.32 | $648,156 |
| Dixon, Denmar J. | 1/24/2013 | 2,100 | $45.81 | $96,201 |
| Dixon, Denmar J. | 1/24/2013 | 7,800 | $46.04 | $359,089 |
| Dixon, Denmar J. | 1/24/2013 | 600 | $46.48 | $27,888 |
| | **TOTAL** | **51,120** | | **$2,359,831** |
| | | | | |
| O'Brien, Mark J. | 5/9/2012 | 9,559 | $19.64 | $187,739 |
| O'Brien, Mark J. | 5/9/2012 | 3,964 | $20.10 | $79,657 |
| O'Brien, Mark J. | 5/10/2012 | 3,100 | $19.81 | $61,411 |
| O'Brien, Mark J. | 5/10/2012 | 5,981 | $20.17 | $120,637 |
| O'Brien, Mark J. | 5/11/2012 | 400 | $20.39 | $8,156 |
| O'Brien, Mark J. | 5/11/2012 | 7,488 | $19.85 | $148,637 |
| O'Brien, Mark J. | 5/14/2012 | 8,167 | $19.51 | $159,338 |
| O'Brien, Mark J. | 5/22/2012 | 5,800 | $18.41 | $106,778 |
| O'Brien, Mark J. | 5/22/2012 | 17,420 | $18.07 | $314,779 |
| O'Brien, Mark J. | 1/7/2013 | 1,523 | $47.87 | $72,906 |
| O'Brien, Mark J. | 1/7/2013 | 11,376 | $47.16 | $536,492 |
| | **TOTAL** | **74,778** | | **$1,796,530** |
| | | | | |

127.    Moreover, the timing of these stock sales was suspicious— several of the Individual Defendants' largest stock sales occurred shortly prior to the Company's disclosure of its internal weakness in early 2013. The most pertinent example is Defendant Dixon— Dixon sold no shares during the Class Period until late January 2013, when he unloaded $2.3 million worth of stock over the course of two days.  Not long after, the Company disclosed its internal control failures in March 2013. Thus, Dixon, who had served on the Company's Audit Committee, and whose Company shares vested well prior to January 2013, sold a huge chunk of stock shortly prior to the disclosure of damaging news.  Both the timing and amount of Dixon's stock sales are suspicious and indicated that he improperly benefitted from insider information.

128.    Further evidence of scienter is the suspicious timing of the resignation of the Company's Executive Vice President and Chief Financial Officer, Charles Cauthen - his resignation was announced on October 3, 2013, mere days after the Company was forced to issue new financial statements with respect to RMS and only weeks before disclosing that the CFPB was considering taking action against Green Tree for violation of the consumer protection laws.

129.    Defendants had strong motivations to keep Walter Investment's stock price inflated, even if that meant misrepresenting the state of the Company's internal controls and compliance with state and federal regulations.

130.    The Individual Defendants' bonus compensations plans directly correlated bonus compensation to the Company's earnings and stock value. For year-end 2012, Defendant O'Brien received over $1 million in incentive compensation based on this plan; Defendant Cauthen received $492,000; Defendant Dixon received $492,000; and Defendant Anderson received over $800,000. Moreover, this compensation "took into account the successful integration of the Green Tree business, the significant financial initiatives that were undertaken

38

in 2012, the opportunistic expansion of the Company's business (both in size and product portfolio) and the continued strong regulatory compliance of the business."

131.    Defendants were motivated to keep the price of Walter Investment's stock artificially inflated in order remain in compliance with and to facilitate agreement refinancing Company debt and revolving loan agreements. The Company entered into several such agreements during the Class Period, including:

     a.   In November 2012, Walter Investment refinanced our $500.0 million first lien term loan facility with a $700.0 million senior secured term loan, or the Secured Term Loan, and refinanced our $90.0 million revolving credit facility with a $125.0 million senior secured revolving credit facility, or the Secured Revolving Facility.

     b.   In January 2013, Walter Investment completed the arrangement of an incremental $825 million facility, or the Incremental Secured Credit Facility, to its existing $700 million Secured Term Loan maturing on November 28, 2017.

     c.   On March 27, 2013, Green Tree entered into a warehouse facility agreement with Credit Suisse First Boston Mortgage Capital LLC. The facility agreement was used to support Green Tree's funding obligations in connection with its residential mortgage loan business. The agreement required Green Tree to comply with certain financial covenants relating to liquidity, adjusted tangible net worth and leverage.

     d.   On May 31, 2013, Green Tree entered into a master repurchase agreement with Bank of America, N.A., which was used to fund Green Tree's obligations in connection with its residential mortgage business. The agreement required Green Tree to comply with certain financial covenants relating to liquidity, adjusted tangible net worth and leverage.

132.    Defendants were motivated to keep the price of Walter Investment's stock artificially inflated in order to facilitate the issuance of new stock options during the Class Period, including:

     a.   In October 2012, Walter Investment closed on a registered underwritten public offering of $290.0 million aggregate principal amount of 4.50% convertible senior subordinated notes, or the Convertible Notes, and with the funds, repaid and terminated its existing higher-cost $265.0 million second lien term loan.

b. In October 2012, Walter Investment closed on a registered underwritten public offering of 6,900,000 shares of its common stock at a price of $42.00 per share, raising net proceeds of $276.1 million.

133.   Defendants were motivated to keep the price of Walter Investment's stock artificially inflated in order to facilitate the Company's acquisition of numerous companies throughout the Class Period, especially the purchase of RMS, which (as noted above) necessitated the issuance of additional Company stock.

134.   Thus, each Defendant either displayed extreme recklessness with respect to, or had the motive and opportunity to issue the misleading statements and omit material information about the Company's shoddy internal controls, servicing errors, abusive collection practices, and the Company's true financial condition to induce investors, including Plaintiffs, to maintain their confidence in the Company's financial position, and keep Walter Investment's stock artificially inflated.

## APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE

135.   At all relevant times, the market for Walter Investment common stock was an efficient market for the following reasons, among others:

a. Walter Investment stock met the requirement for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. The Company had approximately 37,643,598 shares outstanding as of April 20, 2014.  During the Class Period, Walter Investment was traded on an active a broad market, permitting a strong presumption of an efficient market;

c. As a regulated issuer, Walter Investment filed periodic reports with the SEC;

d. Walter Investment regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. Walter Investment was followed by many securities analysts, who wrote reports distributed to the sales force and certain customers of their respective

firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

    f.    Numerous National Association of Securities Dealers members firms were active market-makers in Walter Investment stock at all times during the Class Period; and

    g.    Unexpected material news about Walter Investment was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

136.    As a result of the foregoing, the market for Walter Investment securities promptly digested current information regarding Walter Investment from publicly available sources and reflected such information in Walter Investment's stock price. Under these circumstances, all purchasers of Walter Investment common stock during the Class Period suffered similar injury through their purchase of Company stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

137.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Walter Investment who knew that those statements were false when made.

## LOSS CAUSATION

138.    The market for Walter Investment shares was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Walter Investment shares and operated as a fraud or deceit on Class Period purchasers of Walter Investment shares by misrepresenting the Company's then current state of affairs. Defendants achieved this facade by making knowing misrepresentations and/or omissions about, among other things, the Company's regulatory and legal compliance, collection practices, the value of the RMS acquisition, and material weaknesses in the Company's controls over its collection practices and financial reporting.

139.    As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Walter Investment shares fell precipitously, as the prior artificial inflation came out of the price of the shares. Plaintiffs and other members of the Class purchased or otherwise acquired Walter Investment shares relying upon the integrity of the market price of Walter Investment shares and market information regarding Walter Investment. As a result of their purchases of Walter Investment shares during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

140.    By improperly concealing their conduct, Defendants presented a misleading picture of Walter Investment's financial condition, revenues, the growth, performance, and near-term prospects during the Class Period. Thus, instead of disclosing the truth about these matters, Defendants caused Walter Investment to conceal the truth. These actions caused Walter

Investment shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

141.     The timing and magnitude of the decline in Walter Investment's publicly traded securities negates any inference that the loss suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to Defendants' fraudulent conduct. As a result of their purchases of Walter Investment's publicly traded securities during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities law when the above-described revelations reached the market and the artificial inflation was removed.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

142.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Walter Investment securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

143.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walter Investment securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Walter Investment or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that custom-arily used in securities class actions.

144.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

145.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

146.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Walter Investment;

- whether the Individual Defendants caused Walter Investment to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Walter Investment securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

147.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

148.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Walter Investment securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's Securities; and

- Plaintiffs and members of the Class purchased and/or sold Walter Investment securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

149.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

150.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

151.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

152.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Walter Investment securities; and (iii) cause Plaintiffs and other members of the Class to purchase Walter Investment securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

153.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Walter Investment securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Walter Investment's finances and business prospects.

154.    By virtue of their positions at Walter Investment, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged

46

herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

155.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Walter Investment, the Individual Defendants had knowledge of the details of Walter Investment's internal affairs.

156.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Walter Investment. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Walter Investment's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Walter Investment securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Walter Investment's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the class purchased Walter Investment securities at artificially inflated prices and

relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

157.    During the Class Period, Walter Investment securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Walter Investment securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the class, the true value of Walter Investment securities was substantially lower than the prices paid by Plaintiffs and the other members of the class. The market price of Walter Investment securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and class members.

158.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act)

160.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.     During the Class Period, the Individual Defendants participated in the operation and management of Walter Investment, RMS and/or conducted and participated, directly and indirectly, in the business affairs of Walter Investment's, RMS and/or Green Tree.  Because of their senior positions, they knew the adverse non-public information about Walter Investment's misstatement of income and expenses and false financial statements.

162.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Walter Investment's, RMS', and Green Tree's businesses and results of operations, and to correct promptly any public statements issued by Walter Investment which had become materially false or misleading.

163.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Walter Investment disseminated in the marketplace during the Class Period concerning Walter Investment's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Walter Investment, RMS, and/or Green Tree to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Walter Investments, RMS and/or Green Tree within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated

49

in the unlawful conduct alleged which artificially inflated the market price of Walter Investment securities.

164.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Walter Investment, RMS, and/or Green Tree.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  July 7, 2014

POMERANTZ LLP

_____

Jeremy A. Lieberman
Murielle J. Steven Walsh
Star M. Tyner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

**POMERANTZ LLP**
Jayne A. Goldstein #144088
1792 Bell Tower Lane, Suite 203
Weston, Florida 33326
Telephone: (954) 315-3454
Facsimile: (954) 315-3455

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**THE ROSEN LAW FIRM**
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 7, 2014, the foregoing document was filed electronically with the Clerk of Court using the CM/ECF filing system, which will automatically send electronic notice of such filing to all counsel of record.

*/s/ Laurence Rosen*
Of Counsel

**\*\*\*Summons to be served via certified mail on:**

Keith A. Anderson
c/o Walter Investment Management Corp.
3000 Bayport Drive
Suite 1100
Tampa, Florida 33607

Brian Corey
c/o Walter Investment Management Corp.
3000 Bayport Drive
Suite 1100
Tampa, Florida 33607